[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1251 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1252 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1253 
Larry Benjamin White was convicted of one count of murder made capital because it was committed during the commission of a robbery in the first degree, a violation of § 13A-5-40(a)(2), Ala. Code 1975; one count of murder made capital because it was committed during the commission of a burglary in the first degree, a violation of § 13A-5-40(a)(4), Ala. Code 1975; one count of robbery in the first degree, a violation of § 13A-8-41, Ala. Code 1975; and one count of burglary in the first degree, a violation of § 13A-7-5, Ala. Code 1975. White was sentenced to life imprisonment without possibility of parole for each of the capital-murder convictions and was sentenced to 99 years' imprisonment for each of the other convictions.
The evidence at trial established the following. The victim, Jolene Raybon, had lived with her aunt, Dorothy Madden, for 35 years. On February 23, 2000, Madden arrived home at about 7:30 p.m. and noticed the porch light was not on, which was unusual. When she walked to the front door to unlock it, the door "just pushed open," and there was a "plank" laying in front of the door. It was later determined that the front door had been pried open. *Page 1254 
When Madden looked inside the door she saw Raybon sitting in a chair with blood all over her. Despite the fact that Raybon habitually wore a ring on each finger, earrings, and a gold necklace, Raybon was wearing only two rings and a black, plastic watch when her body was found. It was subsequently determined that five rings and a necklace were missing from Raybon's house. Evidence discovered during the investigation of Raybon's death resulted in White's being arrested and charged with two counts of capital murder, one count of first-degree burglary, and one count of first-degree robbery.
 I.
First, White contends that the trial court violated his right to self-representation by denying his request to serve as his own counsel. White contends that he was prejudiced by this ruling because his appointed trial counsel refused to follow his directions at trial.
An accused "may waive his . . . right to counsel . . . after the court has ascertained that the defendant knowingly, intelligently, and voluntarily desires to forgo that right." Rule 6.1(b), Ala.R.Crim.P. This right is constitutionally guaranteed by the Sixth Amendment to the United States Constitution and by Art. I, § 6, of the Alabama Constitution of 1901. See alsoFaretta v. California, 422 U.S. 806, 834, 95 S.Ct. 2525,45 L.Ed.2d 562 (1975); Tomlin v. State, 601 So.2d 124, 128 (Ala. 1991); Parker v. State, 455 So.2d 111, 112-13 (Ala.Crim.App. 1984); Luckie v. State, 55 Ala.App. 642, 644, 318 So.2d 337,339, cert. denied, 294 Ala. 764, 318 So.2d 341 (1975).
White was indicted on April 27, 2000, for the murder of Jolene Evette Raybon. Although there is no formal pleading in the record, the trial court noted in a bench note, dated October 27, 2000, that White requested to represent himself, and stated: "The Court conducted extensive colloquy with the defendant explaining his rights and ramifications of representing himself." The trial court continued resolution of this issue to a later date "[t]o allow defendant additional time to reconsider his request." (C. 2.) The "colloquy" referenced by the trial court is not included in the record. However, on October 23, 2001, almost one year after the bench note was made, the trial court entered an order denying White's request to serve as his own counsel, writing: "The Court finds from the seriousness of the alleged offense[s], it would not be in the best interest of the defendant to represent himself. . . . [D]efendant's request to represent himself in this matter is denied." However, in that same order, the trial court dismissed White's appointed attorneys, and appointed new attorneys to represent White. (C. 29.)
After the trial court dismissed White's first appointed attorneys, White did not reassert a request to serve as his own attorney. See Parker, 455 So.2d at 112 (trial court did not err by refusing to permit defendant to represent himself where the request was made after trial started). White was, however, permitted to be actively involved in his defense. For example, White made a pro se, oral motion during trial, arguing that a juror should have been removed from the jury because she was acquainted with the victim's family. (R. 760.) On another occasion, White was permitted to argue that he was prejudiced because members of the jury panel saw him wearing handcuffs and shackles. (R. 499-502.) Also, White's counsel, out of the hearing of the jury, stated:
 "[DEFENSE COUNSEL]: Judge, you've had a lot of experience dealing with Mr. White and you know how cantankerous and irritable he can be. He's made us meticulously sit down with him *Page 1255 
and go over [every] piece of evidence that is in this case, including all the photos and various things like that. He has pointed out to us numerous times, just in the little bit, that we didn't get a copy of that next exhibit that the State is fixing to offer, . . . [a]nd he's right. Today is the first time we've seen it. So we're objecting to the State attempting to offer it and show it at this point. . . ."
(R. 573-74.)
White states in his brief: "It is obvious from the pleadings in the case . . . that Mr. White was dissatisfied with his attorneys at the time as they ultimately sought to be relieved and were granted leave to withdraw and were then replaced by additional new appointed counsel." (See principal brief of White at 55.) White's dissatisfaction with his first attorneys appears to have been the basis for his request to serve as his own counsel, especially in light of the fact that White did not reassert his request to serve as his own counsel after new counsel was appointed. A request to represent one's self must be made "clearly and unequivocally." Faretta, 422 U.S. at 835,95 S.Ct. 2525. Other than his statement that his trial counsel failed to follow his directions, White has not shown how he was prejudiced by the trial court's refusal to let him serve as his own counsel. Based upon the facts and circumstances of this case, we do not find error in the trial court's refusal to allow White to serve as his own counsel.
 II.
Next, White argues that he was prejudiced when veniremembers were allowed to see him in handcuffs and shackles. White moved for a mistrial on that basis; the trial court denied the motion.
The deputy who accompanied White to the courtroom informed the trial court that the sheriff's department changed its policy "for this particular trial, based on your instructions and did not use shackles yesterday or today." The deputy stated that he turned his back to the door to block the view of the jurors when he removed the restraints, but conceded that on one occasion a potential juror might have seen him removing the restraints from White. The deputy showed the trial court the restraint belt that was being used to escort White to and from the courtroom. The trial court denied White's motion for a mistrial and noted: "I see no prejudice. It looks like a regular belt to me." (R. 500-02.) White did not contend, and has not established, that any veniremember who might have seen him handcuffed or in shackles served on the jury that convicted him. The morning after White raised his concerns, the trial court, in revisiting the issue, stated that it believed White to be a security risk based upon "a [previous] physical altercation with the police officers while he was in custody," which the court described as being more than "just a minor incident." The trial court observed that, because of these past problems, the deputy had the right to take "reasonable" precautions under the circumstances. (R. 553-54.) White did not contest the trial court's comments at trial.
As we observed in Taylor v. State, 372 So.2d 387, 389-90
(Ala.Crim.App. 1979):
 "The possibility of some prejudice to defendant in what occurred as narrated by defendant's counsel is not to be ignored, but there is not a sufficient showing thereof to justify the conclusion that the trial court was in error in overruling defendant's motion for a mistrial. Appellant relies upon the sound general statement in Clark v. State, 280 Ala. 493, 496, 195 So.2d 786, 788 (1967):
 "`. . . All of the authorities we have studied are agreed that to bring a prisoner before the bar of justice in *Page 1256 
handcuffs or shackles, where there is no pretense of necessity, is inconsistent with our notion of a fair trial, for it creates in the minds of the jury a prejudice which will likely deter them from deciding the prisoner's fate impartially. . . .'
 "Not to be overlooked, however, is the distinction made in Clark between handcuffing a prisoner in taking him to and from the court and in keeping him in handcuffs while he is being tried, unless there is reasonable ground for belief that such restraint is necessary to prevent his escape or his rescue.
 "`Furthermore, it is not ground for a mistrial that an accused felon appear in the presence of the jury in handcuffs when such appearance is only a part of going to and from the courtroom. This is not the same as keeping an accused in shackles and handcuffs while being tried. Rhodes v. State, 34 Ala.App. 481, 41 So.2d 623.'
 "Evans v. State, Ala.Cr.App., 338 So.2d 1033, cert. denied, 348 So.2d 784 (1977)."
See also Young v. State, 416 So.2d 1109, 1112 (Ala.Crim.App. 1982), in which we stated: "`A sheriff who is charged with the responsibility of safely keeping an accused has the right in his discretion to handcuff him when he is bringing him to and from the courtroom, when the handcuffs are removed immediately after he is taken into the courtroom.'" Quoting Moffett v. State,291 Ala. 382, 384, 281 So.2d 630, 632 (1973).
The trial court's denial of White's motion for a mistrial on this basis was not error.
 III.
White next claims that he was prejudiced because the State failed to produce certain documents and information that he requested prior to trial. White specifically contends that the State failed to produce certain photographs, all of the negatives of the photographs taken by the State, and documents related to the certification of the Alabama Department of Forensic Sciences ("ADFS") lab in Huntsville, where the DNA testing in this case was done.
First of all, we know of no rule that requires the State to produce negatives of photographs where the actual photographs are produced to an accused. In fact, Rule 16.1(c), Ala.R.Crim.P., provides that the prosecutor shall permit the accused to copy "photographs" in her possession. The rule does not require the prosecutor to turn over negatives of the photographs. In his pretrial request seeking the negatives, White asked that the negatives of any photographs taken by the State be turned over to him or, "in the alternative," asked that "the State [be ordered to] reproduce the photos for [White]." (C. 80.) White does not identify any photographs that were not produced, nor does he contend that the photographs that were produced did not accurately and clearly depict the items in the respective photographs.
White does contend, however, that some photographs were not produced until trial. During trial, the prosecutor informed the trial court that she forgot to show White certain autopsy photographs. The photographs were made available for White's review; White was given ample opportunity to review the photographs; and White did not object to the admission of the photographs on the grounds that they had not been produced before trial. (R. 765.) On a second occasion during trial, White objected to an aerial photograph introduced by the State that depicted the area around the crime scene on the basis that he was not shown the photograph before trial. (R. 573-74.) White was not prejudiced by this exhibit because he used it throughout the trial in an attempt *Page 1257 
to bolster his theory that Emily Newton, White's girlfriend, killed Jolene Raybon because she was jealous of Raybon.[1]
As for the documents related to the certification of the ADFS lab in Huntsville, the record reveals that White cross-examined Nancie Jones, the state forensic scientist, at length about problems with the Huntsville lab where the DNA testing was done, including the fact that the lab was not certified at the time it performed the DNA testing in this case. (R. 1026, 1047.) Jones also made other concessions with respect to problems at the lab, and the documents White contends were not produced were used by him to cross-examine Jones. White was also able to establish that Dr. Stephen Pustilnik, the ADFS physician who performed the autopsy on Raybon, had been disciplined in the past because of questionable work performed by him. White requested a copy of Dr. Pustilnik's personnel file before trial. A copy was made available to him during trial, and he was permitted to impeach Dr. Pustilnik on the file materials. (R. 733-34, 759, 804-18.)
The decision to exclude evidence based upon the untimely production of the evidence is a matter that rests within the sound discretion of the trial court. See Rule 16.5, Ala.R.Crim.P. (setting forth options available to the trial court in the event a party fails to comply with the discovery rule or order);Morrison v. State, 601 So.2d 165, 173 (Ala.Crim.App. 1992) (to justify reversal for a discovery violation, the accused must establish prejudice to substantial rights). The record reveals that the trial court made sure White had plenty of opportunity to review the tardily disclosed evidence. White did not request additional time to review the items in question. See Grimes v.State, 689 So.2d 956, 959 (Ala.Crim.App. 1996); Nesbitt v.State, 531 So.2d 37, 40-41 (Ala.Crim.App. 1987).
Resolution of such issues are within the discretion of the trial court, and we do not find that the trial court abused its discretion in admitting the challenged evidence.
 IV.
In a related argument, White claims that the trial court erred by refusing to permit him to challenge certain aspects of the ADFS laboratory and its testing procedures. It is unclear what White alleges is error on this issue. At one point, it appears that White is complaining that Nancie Jones and Dr. Stephen Pustilnik should not have been permitted to testify as experts. White then seems to argue that certain answers elicited from or given by these witnesses were not proper. And White seems to claim that he was not permitted to impeach the witnesses. Whatever the true nature of White's claim may be, his contentions are not supported by the record.
Nancie Jones testified that DNA evidence connected White with certain physical evidence in this case. The State established Jones as an expert in DNA analysis and testing. On cross-examination, White had Jones go through an extensive analysis of DNA testing, including the types of testing done, the problems that can arise in testing, the potential for error in the process, and the fact that DNA testing results in a statistical analysis or "estimation." White also challenged Jones's findings in this case, and Jones conceded that she could not say with 100% *Page 1258 
certainty that the DNA she identified in this case was White's, only that she was able to include him or exclude him as a possible donor on the items submitted to her for analysis. White then went into a lengthy colloquy with Jones about the national standards and accreditation organizations applicable to DNA testing and laboratories where DNA testing is performed. White also asked Jones about the auditing process, about quality-control standards, and about other aspects of the DNA program. Jones conceded that the Huntsville laboratory, where she worked and where the DNA testing in this case was done, was not accredited at the time of the testing and that the lab's request to be accredited had been denied. (R. 979-1029.) White also had Jones, during a recess, review some internal and external audits performed on the lab and questioned her at length about deficiencies in the lab as reflected in the audits. (R. 1030-46.)
White did not inform the trial court before or during the cross-examination of Jones that he needed additional documentation or information that would have further aided him in his examination of Jones. White's claims to this effect are, therefore, without merit and are not supported by the record.
Dr. Pustilnik testified as to the injuries inflicted upon Raybon and the cause of her death. The State established that he was a licensed physician, trained in forensics, and qualified to do autopsies. On cross-examination of Dr. Pustilnik, as set forth in Part III of this opinion, White sought to impeach Dr. Pustilnik's findings and qualifications, based primarily upon disciplinary action that had been previously taken against Dr. Pustilnik by his former supervisor at ADFS for an erroneous finding in an unrelated case.
The trial court allowed White to delve into these matters for the purpose of challenging the witnesses, their findings and the ADFS system. White's claims to the contrary are unfounded. Further, the impeachment of these witnesses did not disqualify them as experts. Instead, the impeachment placed a cloud over their testimony and findings and affected the weight, not admissibility, of their testimony and conclusions. "`The weight and probative value to be given to the evidence, the credibility of the witnesses, the resolution of conflicting testimony, and the inferences to be drawn from the evidence, even where susceptible to more than one rational conclusion, are for the [trier of fact].'" Poole v. State, 650 So.2d 541, 543
(Ala.Crim.App. 1994) (quoting Ward v. State, 356 So.2d 238, 240
(Ala.Crim.App. 1978)).
We find no basis to justify the reversal of White's convictions based upon these claims.
 V.
White next argues that the trial court erred by refusing to dismiss the jury panel, where, he contends, the panel was assembled and instructions given to it in the absence of White or his attorneys. After voir dire began, the following occurred:
 "[DEFENSE COUNSEL]: Judge, . . . [w]hen we arrived this morning, . . . I believe the jury was already in the room, or a[t] least the panel was in the room receiving some instructions, I believe from the clerk. I believe that Mr. White has a constitutional right to be present during all times that the panel is together and being instructed. We would move to dismiss the panel on those grounds.
 "THE COURT: Deny that Motion. I was not here but generally what we do is they give where to park, where the restrooms are, nothing about the case. *Page 1259 
It's kind of an instruction on where everything is and giving some bearings for the people."
(R. 112-13.)
There is no indication in the record that the case was discussed in White's absence. It is common practice for circuit clerks to assemble veniremembers and to go over with them preliminary matters in an accused's absence. It distorts reason to say that White has a constitutional right to be present during this process. Rule 9.1(a), Ala.R.Crim.P., sets forth that an accused has the right to be present "at every stage of the trial, including the selection of the jury. . . ." The clerk's initial assembling of the jury does not constitute "selection of the jury." White's argument to the contrary is without merit.
 VI.
White contends that the trial court erred when it denied his request to have a "newly discovered witness," who was in state custody, brought to the court for his attorneys to interview or to authorize funds for White to hire an investigator to go to the witness and interview him.
White's argument is premised upon comments made by a potential juror during voir dire. During individual questioning, the juror, F.B.T., stated he knew John Hardy, the brother of Emily Newton, White's former girlfriend, and that he spoke with Hardy by telephone from time to time. F.B.T. stated that Hardy told him on one occasion that his sister was in jail, and that it was related to White's case. When asked if Hardy told him anything about this case, F.B.T. stated: "I don't think [it] was anything important, but I do remember something to do with a necklace and his sister — I don't know. It's sketchy at best. . . ." F.B.T. was also asked if Hardy informed him that his sister was in any way involved in the murder, and F.B.T. stated: "I recall him saying that I think she received a necklace or the purpose was she got the necklace or the purpose of him — he got the necklace for her or something of that nature, I think." (R. 148, 293-94.)
After the trial had begun, White requested the trial court to have Hardy brought to the courthouse or to grant him funds to have Hardy interviewed. The trial court denied this request. (R. 619-20.)
The State, in its brief to this Court, responded to White's argument by noting: (1) that any information Hardy might have been able to provide would have been inadmissible hearsay, premised upon conversations he had had with his sister; (2) that an indigent defendant must make a "specific showing of need for the funds" to hire an investigator; and (3) that an accused must offer "more than undeveloped assertions" to establish the requested assistance is needed, citing Hold v. State,485 So.2d 801, 803 (Ala.Crim.App. 1986), and other authority. The State further contends that White could have expended minimal expense by speaking with Hardy on the telephone to determine if he had any information that might be beneficial to White, which might warrant further investigation and expense. (See brief of State at 65-67.) We agree with the State. White has failed to establish that Hardy was critical to his defense. See Ex parte Grayson,479 So.2d 76, 82 (Ala. 1985) (opinion on rehearing), quoting Akev. Oklahoma, 470 U.S. 68, 83, 105 S.Ct. 1087, 84 L.Ed.2d 53
(1985) (accused entitled to appointment of psychiatrist where sanity was shown to be "`a significant factor at trial,'" but this same logic does not necessarily extend to other experts for just any defense accused wishes to assert). Also, in Travis v.State, 776 So.2d 819, 846-47 (Ala.Crim.App. 1997), aff'd,776 So.2d 874 (Ala. 2000), cert. denied, *Page 1260 531 U.S. 1081, 121 S.Ct. 785, 148 L.Ed.2d 681 (2001), we discussed the distinction between "newly disclosed" evidence and "newly discovered" evidence and restated that an accused is entitled to a new trial (1) where evidence is newly discoveredafter trial, (2) where evidence could not have been discovered before trial "`by due diligence on the part of the movant,'" (3) where "`the evidence is material to the issue of . . . guilt,'" (4) where "`the evidence is not merely cumulative or impeaching,'" and (5) where "`the evidence would probably change the outcome if a new trial was granted.'" Quoting Gillespie v.State, 644 So.2d 1284, 1289 (Ala.Crim.App. 1994).
In Grayson, 479 So.2d at 79, our Supreme Court noted that an independent expert may be warranted if the evidence at issue is "critical" and "subject to varying expert opinions." The Court observed: "To be `critical,' the evidence must be the only evidence linking the accused with the crime or proving an element of the corpus delicti." Id. At best, Hardy might have given testimony that could have implicated his sister in the Raybon's murder, but there is no indication that Hardy could have exonerated White. Even in the absence of Newton's testimony, the evidence at trial established that White murdered Raybon. Too, it is likely that Hardy's testimony would have been based upon what his sister told him. See Ex parte Griffin, 790 So.2d 351, 354
(Ala. 2000) (before evidence that some other person committed the crime charged can be admissible, three elements must exist: (1) evidence must relate to "res gestae" of the crime; (2) evidence must exclude the accused as perpetrator of the offense; and (3) evidence would have to be admissible if the third party was on trial). Because these three elements were not established, the trial court's denial of White's requests was not error.
 VII.
White further contends that the trial court made numerous inconsistent evidentiary rulings. Whether evidence is properly admitted or excluded is typically a matter that rests within the sound discretion of the trial court, and such rulings will not be disturbed absent a showing that a "substantial right of the [defendant] is affected." Rule 103(a), Ala.R.Evid.
 A.
White argues that the trial court improperly allowed Detective Chris Slaton, the lead investigator on this case and a member of the Athens Police Department, to offer testimony regarding the automated fingerprint identification system ("AFIS"). White objected at trial to Det. Slaton's testifying about fingerprints that were removed from the scene of the crime, which were submitted to AFIS, "[u]nless he has personal knowledge of it, was there and did it himself. . . ." White also objected, claiming that such testimony would be hearsay. The trial court responded that Det. Slaton could testify as to what the typical procedures are in submitting prints to AFIS and how those results are reported back to the law-enforcement agency, but that Det. Slaton could not testify about the actual results in this case unless he had firsthand knowledge. (R. 915-17.) Det. Slaton then testified that the Athens Police Department routinely submits prints of all persons arrested to AFIS and that it is "standard" to send fingerprints to AFIS for comparisons to attempt to obtain a match with persons in the data bank. (R. 918.) Slaton offered no further testimony on this issue.
Given these circumstances, it is unclear what White contends the error to be. In *Page 1261 
fact, other than Rule 801(c), Ala.R.Evid., White submits no authority to support any claim of error. See Rule 28(a)(10), Ala.R.App.P. (requiring that an argument contain "the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on"). Det. Slaton did not go into any details about the fingerprint-comparison process and offered no testimony about what was done to attempt to identify fingerprints that were submitted to AFIS by the Athens Police Department in this case. Det. Slaton did testify, duringquestioning by White's counsel, as to what prints were lifted, the process of lifting prints, and the process of submitting the prints in this case to the Department of Public Safety and to AFIS for comparison and possible identification. Det. Slaton also testified, during questioning by White's counsel, as to whose prints were collected and submitted for comparison, and he confirmed that the prints taken from the scene did not match White's prints and that the submitted fingerprints were never identified. (R. 890-93.) If anything, this testimony and evidence aided White in his defense. White's claim in this respect is, therefore, without merit.
 B.
White also contends that the trial court committed error by permitting Det. Slaton to testify regarding "the means by which he `corroborated' the `truthfulness' of Emily Newton's version of what occurred." During the redirect examination of Det. Slaton by the prosecutor, Det. Slaton was asked what he did to try and confirm that Emily Newton was telling him the truth. Emily Newton was White's girlfriend and had given Det. Slaton a statement that she dropped White off at Raybon's house shortly before Raybon was murdered. Newton testified that she left there and met another man, Richard Thompson, at another location. It was White's position that this crime was not a typical robbery or burglary and murder, but was more akin to a hate killing, and White tried to establish that Newton killed Raybon out of jealousy. (R. 878.)
Det. Slaton testified that Newton took him to Raybon's house and to another location where she and White hid a few hours after the murder. Det. Slaton also testified that White himself confirmed Newton's story in his statement by verifying Newton's "involvement and activities that day." (R. 918-20.) White objected when questions were posed to Det. Slaton about his attempts to verify Newton's story through Richard Thompson. White contended that the testimony was hearsay. Slaton confirmed that he spoke with Thompson at the location where Newton had told him she met Thompson after she dropped White off at Raybon's house. (R. 921-22.)
Again, it is not clear what error White contends actually occurred. His only objection seems to be that Slaton was permitted to testify about hearsay, but Slaton did not testify about what Thompson told him, only that he met Thompson at the location where Newton had testified she met Thompson. And the only authority cited in support of this issue by White is the hearsay rule, Rule 801(c), Ala.R.Evid. See Rule 28(a)(10), Ala.R.App.P. Slaton's testimony about what he did was not hearsay. Furthermore, we note that White opened the door to the questions to Slaton about his contact with Thompson because during cross-examination White's counsel asked Slaton what efforts he made to verify Newton's statements to him, and Slaton testified that, among other things, he took a statement from Thompson. (R. 846-52, 888, 898.) "Under the doctrine of invited *Page 1262 
error, a defendant cannot by his own voluntary conduct invite error and then seek to profit thereby." Phillips v. State,527 So.2d 154, 156 (Ala. 1988).
 C.
White next contends that the trial court committed error by refusing to permit Det. Slaton to testify regarding information in his file. During cross-examination of Det. Slaton, White's counsel asked Slaton if anyone had told him that the victim had been raped.[2] Det. Slaton testified that Captain Marty Bruce spoke with Dr. Pustilnik and that the notes were in his file, but that he was not present when the conversation took place. The State objected to Det. Slaton's testifying about any conversations Dr. Pustilnik and Capt. Bruce had had. White's counsel stated, "I just asked him if anybody told him she was raped," and the prosecutor pointed out that Det. Slaton testified that he was not told this. The trial court sustained the objection. (R. 926.) Nevertheless, White's counsel again asked Det. Slaton if anyone told him that Raybon had been raped or whether semen or other body fluids were present at the victim's home. Det. Slaton testified that he was told this information "[t]hrough notes." Det. Slaton also testified that the notes in the file indicated "possibly semen present." He then read from the note, which stated: "An autopsy was order[ed] and forensic pathologist determined that the victim had been raped and that semen and body fluids were present from the offender." (R. 927-29.)
Again, it is unclear what issue White is raising. The evidence he claims he was precluded from eliciting was, in fact, testified to by Det. Slaton. White's argument to the contrary is baseless and without merit.
 D.
White next argues that the trial court wrongly precluded him from introducing evidence showing that Emily Newton had stabbed other women out of jealousy over White. As his first witness, White recalled Emily Newton to the stand to testify. He asked Newton if she was jealous or had been jealous of other women in White's life. Newton denied that she had been jealous; she denied that she had ever threatened to throw a chair at White for talking to other women; she denied that she ever stated "[i]f I can't have him, nobody will"; and she denied that she threatened to stab another woman out of jealousy. (R. 1074-76.)
White also called Kimberly Clemmons to testify. Clemmons testified that in February 2000 she was White's girlfriend. Clemmons testified that Newton called her "twelve or thirteen times" and told her that if she "didn't leave Mr. White alone that she would kill me." Clemmons specifically testified that Newton told her that she would "stab [her to] death." On one occasion, according to Clemmons, Newton came by her house, waved a kitchen knife at her, and threatened to kill her. Clemmons also testified that she was afraid of Newton. (R. 1084-86.) White also asked Clemmons: "Did you ever hear Emily Newton make any other threats against anybody else?" (R. 1092.) The *Page 1263 
prosecutor objected that the question called for hearsay and that objection was sustained. White did not attempt to make any showing why the testimony should be permitted, nor did he try to argue that the testimony was not hearsay or that it should have been admitted as an exception to the hearsay rule. The trial court did not abuse its discretion by excluding this testimony.
 E.
White also argues that the trial court wrongly permitted other "bad character evidence" about White to be admitted into evidence. Based upon the page numbers to the record cited by White in his brief, it appears that he is contending that the trial court erred by permitting Emily Newton to testify about a conversation she and White had before he was arrested. Newton testified that she went by White's house after 4:00 a.m. the morning after Raybon was murdered. Shortly after she arrived, the police pulled up in White's driveway, and she and White took off running and hid underneath a car in a neighbor's yard. Newton testified that while they were hiding, White told her that he had something to tell her and that he might be "gone for a minute." White objected at trial that the questions were "asked and answered," that Newton should not be permitted to read aloud from the statement she had given to police, that the prosecutor was attempting to impeach its own witness, and that the prosecutor was leading the witness. The prosecutor asked Newton if she thought White was trying to tell her that he did something that would cause him to go to prison. Newton responded that she did not know what White was going to tell her or what he meant by the vague remarks. (R. 650-55.)
White also contends that the trial court impermissibly permitted Newton to refer to a letter White wrote to her about three weeks before trial. White objected, claiming that the State had never produced the letter. The prosecutor asked Newton if she had received a letter from White. Newton confirmed that she did. No further testimony was elicited from Newton about the letter or its contents. (R. 678-79.) After Newton testified, White again objected, noting that the prosecutor did not produce the letter in discovery, that he was never given any notice of the letter, and that the "implication" was "that [White] tried to get [Newton] to fabricate some story and that's why she's changed her story here today on the stand." The prosecutor responded that he did not have the letter, that Newton had the letter, and that she never provided the letter to him. (R. 681.)
White has cited only Rules 404(b) and 801(c), Ala.R.Evid., in support of this argument. See Rule 28(a)(10), Ala.R.App.P. White did not object to the letter on the basis that it was improper collateral-crime evidence, nor did White contend that the testimony constituted hearsay. Thus, the arguments White asserts on appeal are not the specific objections he made at trial. "`The statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial.'" Culp v. State, 710 So.2d 1357,1359 (Ala.Crim.App. 1996) (quoting Ex parte Frith,526 So.2d 880, 882 (Ala. 1987)). Even if the objections were sufficient, the challenged testimony does not constitute collateral crime evidence or hearsay. Newton did not testify that White told her or implied that he committed a separate crime, and Newton did not read from the letter or reference its contents. As a result, White's arguments on these issues are without merit. *Page 1264 
Moreover, Det. Slaton testified, without objection, that White was in jail when he took a statement from him, and later stated that White was in jail on a theft charge at the time. White objected to Det. Slaton's reference to another charge, but his objection came after Slaton made his comment. "`An objection to a question, made after an answer is given, is not timely and will not preserve the issue for review.'" Roper v. State,695 So.2d 244, 246 (Ala.Crim.App. 1996), cert. denied, 695 So.2d 249 (Ala. 1997) (quoting Scott v. State, 624 So.2d 230, 234
(Ala.Crim.App. 1993)). See also Ex parte Crymes, 630 So.2d 125,127 (Ala. 1993) (holding that "[a] proper objection must be made after the question calling for objectionable testimony is asked and before the witness answers"). Further, the trial court precluded further testimony along these lines, which White's counsel acknowledged was satisfactory. (R. 829, 834-35.)
 F.
White's last evidentiary challenge is that the trial court erred by permitting the State to introduce an aerial photograph of the area surrounding the victim's home and to introduce numerous photographs taken of the victim's body at the crime scene and before and during the autopsy. As we stated in Travisv. State, 776 So.2d at 869:
 "`Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Chunn v. State, 339 So.2d 1100, 1102
(Ala.Cr.App. 1976). To be admissible, the photographic material must be a true and accurate representation of the subject that it purports to represent. Mitchell v. State, 450 So.2d 181, 184
(Ala.Cr.App. 1984). The admission of such evidence lies within the sound discretion of the trial court. Fletcher v. State, 291 Ala. 67, 277 So.2d 882, 883
(1973); Donahoo v. State, 505 So.2d 1067, 1071
(Ala.Cr.App. 1986) (videotape evidence). Photographs illustrating crime scenes have been admitted into evidence, as have photographs of victims and their wounds. E.g., Hill v. State, 516 So.2d 876
(Ala.Cr.App. 1987). Furthermore, photographs that show the external wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters. E.g., Burton v. State, 521 So.2d 91 (Ala.Cr.App. 1987). Finally, photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors. Hutto v. State, 465 So.2d 1211, 1212 (Ala.Cr.App. 1984).'
 "Ex parte Siebert, 555 So.2d 780, 783 (Ala. 1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990)."
When the State attempted to elicit testimony about the aerial photograph, White objected, contending that he had not previously been provided a copy of the photograph. Investigator Ken Williams with the Athens Police Department testified that he took the photograph from a helicopter shortly after the crime was committed and that the photograph fairly and accurately depicted the area of the crime. (R. 573-76.) The aerial photograph assisted the jury to determine landmarks critical to events that occurred in the case.
Investigator Williams also testified that he took numerous photographs of the crime scene, which included the *Page 1265 
body of the victim. The photographs he took were admitted into evidence without objection by White. (R. 563-66.) Prior to the admission of the autopsy photographs, however, White objected, claiming the photographs were "cumulative" of some of the crime scene photographs, that the photographs were not probative, and that the prejudicial effect of the photographs outweighed their probative value. The prosecutor responded that she was using 20 photographs from the autopsy, that she had many more, and that she was using only those photographs necessary to depict the different injuries. (R. 766-69.) We have reviewed the testimony relative to the autopsy photographs, and it is apparent that each photograph was used to discuss different injuries. The fact that some of the photographs may have duplicated certain injuries would not have justified their exclusion from evidence. Too, the autopsy photographs were used to specifically identify the injuries and cause of death, which were not as easily ascertainable from the crime scene photographs. As we wrote inTravis, 776 So.2d at 870, quoting, Click v. State,695 So.2d 209, 221-22 (Ala.Crim.App. 1996):
 "`[P]hotographs that depict the character and location of external wounds on the victim's body are admissible even if they constitute cumulative evidence of an undisputed matter. Hines v. State, 365 So.2d 320, 321 (Ala.Cr.App.), cert. denied, 365 So.2d 322 (Ala. 1978); Lovett v. State, 491 So.2d 1034, 1035 (Ala.Cr.App.), cert. denied, 491 So.2d 1039 (Ala. 1986). Moreover, the admission of photographs in a criminal prosecution is within the sound discretion of the trial judge. Magwood v. State, 494 So.2d 124 (Ala.Cr.App. 1985), aff'd, 494 So.2d 154 (Ala. 1986), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986); Holland v. State, 424 So.2d 1387 (Ala.Cr.App. 1982).'"
The trial court did not abuse its discretion by admitting the photographs into evidence.
 VIII.
White contends that the trial court erred by denying certain of his challenges for cause. White argues that jurors numbers 2 ("B.J.A."), 6 ("V.M.A."), 15 ("S.S.B."), 20 ("A.H.C."), 56 ("T.H.J."), and 109 ("B.M.T.") should have been removed for cause. White concedes that he exercised peremptory strikes to remove all of the challenged veniremembers, except V.M.A. and B.M.T. The record reflects that the State exercised one of its peremptory strikes to remove B.M.T. from the jury. (C. 259; R. 493.) V.M.A. served on the jury. The Alabama Supreme Court has held that the failure to remove a juror for cause is harmless when that juror is removed by the use of a peremptory strike.Bethea v. Springhill Mem'l Hosp., 833 So.2d 1 (Ala. 2002). Therefore, to the extent that any of those jurors should have been removed for cause, any such error was rendered harmless by their ultimate removal from the jury.
As for V.M.A., White did not seek to have her removed for cause. After testimony had been taken, White himself informed the trial court that V.M.A. should not be permitted to remain on the jury because she knew a member of the victim's family. White's counsel informed the trial court that during voir dire V.M.A. indicated "that she was remotely acquainted with . . . an uncle of the deceased." White's counsel further noted: "It was our belief and our trial strategy that [V.M.A.] had other qualities that were more important than her acquaintance with [the victim's uncle]. And for that reason, we left her on the jury. And we explained to Mr. White a little while ago when he brought this to *Page 1266 
our attention this morning that we felt that she did have other qualities that we thought were more important than that remote association or acquaintance with a distan[t] relative." (R. 761.) White's failure to object to the juror before the jury was sworn and seated constitutes a waiver of this issue. "Challenges for cause shall be made before the parties begin striking the jury. . . ." Rule 18.4(e), Ala.R.Crim.P. Furthermore, a juror's acquaintance with the family member of a victim is not, alone, a sufficient basis to remove that juror for cause. See § 12-16-150, Ala. Code 1975.
 IX.
White also contends that the evidence was not sufficient to sustain his convictions for capital murder, robbery and burglary. "`In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.'" Ballenger v. State,720 So.2d 1033, 1034 (Ala.Crim.App. 1998) (quoting Faircloth v. State,471 So.2d 485, 488 (Ala.Crim.App. 1984), aff'd, 471 So.2d 493
(Ala. 1985)). "`The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.'" Nunn v. State, 697 So.2d 497, 498 (Ala.Crim.App. 1997) (quoting O'Neal v. State, 602 So.2d 462, 464 (Ala.Crim.App. 1992)). "`When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court's decision.'" Farrior v.State, 728 So.2d 691, 696 (Ala.Crim.App. 1998) (quoting Ward v.State, 557 So.2d 848, 850 (Ala.Crim.App. 1990)). "The role of the appellate courts is not to say what the facts are. Our role . . . is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury." Exparte Bankston, 358 So.2d 1040, 1042 (Ala. 1978).
The jury found White guilty of robbery in the first degree, burglary in the first degree, and two counts of capital murder. "The following are capital offenses:. . . . (2) Murder by the defendant during a robbery in the first degree or an attempt thereof committed by the defendant. . . . (4) Murder by the defendant during a burglary in the first . . . degree or an attempt thereof committed by the defendant. . . ." § 13A-5-40, Ala. Code 1975. A person commits murder if "[w]ith intent to cause the death of another person, he causes the death of that person." § 13A-6-2(a)(1), Ala. Code 1975. A person commits robbery in the first degree if he, "in the course of committing a theft . . . [u]ses force against the person of the owner . . . with intent to overcome [her] physical resistance or physical power of resistance; or . . . [t]hreatens the imminent use of force against the person of the owner . . . with intent to compel acquiescence to the taking of or escaping with the property," §13A-8-43, Ala. Code 1975, and the person "[i]s armed with a deadly weapon or dangerous instrument; or . . . [c]auses serious physical injury to another." § 13A-8-41, Ala. Code 1975. "A person commits the crime of burglary in the first degree if he knowingly and unlawfully enters or remains unlawfully in a dwelling with intent to commit a crime therein, and, if, in effecting entry or while in [the] dwelling or in immediate flight therefrom, he . . . (1) Is armed with . . . a deadly weapon; or (2) Causes physical injury to any person who is not a participant in the crime; or (3) *Page 1267 
Uses . . . a dangerous instrument." § 13A-7-5(a), Ala. Code 1975.
Detective Chris Slaton of the Athens Police Department was the lead investigator on this case. He testified that when he arrived at the scene, he found the victim "sitting or lying in a chair, [with] multiple wounds to the torso area, [and] quite a bit of blood. And [he] also observed a ligature around her neck." He determined that Raybon had been strangled with "a curtain tie from a curtain situated in the living room of her house." (R. 822-24, 839.) An autopsy confirmed that Raybon had been strangled, had been beaten about the neck and back of the head, had suffered a hemorrhage of the brain, was bruised on her arms, legs and back, and had been stabbed multiple times in the chest, neck and face. (R. 768-88.) The cause of death was determined to be "homicide by multiple means," which included "[t]he stab wounds and blunt force trauma" to the head. (R. 789.) Though the actual murder weapon was not identified, it was determined that the stab wounds were caused by a "single edged knife." (R. 791, 801.) Two single-edged knives that had been taken from Raybon's home were found in a nearby field. (R. 569-70, 691-92, 861.)
Emily Newton testified that White was her boyfriend in February 2000. She stated that on February 3, 2000, she and White got together at about noon, bought some beer, and started drinking. She testified that White then went by the house of a drug dealer, known as "Do Long," and purchased some crack cocaine, and that they later smoked it together. At about 4:30 p.m., White asked her to take him to his cousin's house, who lived next door to the victim. White's cousin was not at home, so White went next door, knocked on the door, and spoke to Raybon "through the screen door" for about 15 minutes. (R. 623-35.) Raybon's boyfriend, Gerald Patrick, testified that he spoke with Raybon on the telephone between 4:45 and 5:30 p.m. and that during the conversation Raybon told him someone was at the door. He testified that she stepped away from the telephone for about 10 minutes and that he could hear voices. He asked Raybon who was at her house, and she told him that he probably did not know them. Patrick testified that he did not know White. (R. 602-12.)
Newton testified that she and White then went and purchased some more crack cocaine and that she took White by Raybon's house at about 5:15 p.m. Newton stated that White directed her to come back and pick him up in 30 minutes or to call him at his mother's house. According to Newton, the front porch light was on, and White walked up to the door and knocked, but no one came to the door. Newton testified that White returned to the car, removed a sack of beer, and told her that he was going to wait on the front porch until someone came home. Newton stated that she then left and did not return to Raybon's house. (R. 635-38.) Newton testified that the next contact she had with White was at 4:15 a.m. the next morning, when she spoke with him by telephone. Newton stated that, after she spoke with White by telephone, she went to his house. Newton testified that a few minutes after she arrived the police pulled in White's driveway and that she and White took off running and hid underneath a car in a neighbor's yard.[3] (R. 646-55.)
Willie Driskell testified that he was a neighbor of Raybon and that he had *Page 1268 
known White most of his life. Driskell stated that White came by his house after dark on February 3, 2000. Driskell testified that it was unusual for White to come by his house after dark and that he thought it was about 6:30 or 7:00 p.m. (R. 686.) Driskell testified that when White came to his house, he had a plastic bag with him that contained beer, that White offered him a beer, and that White asked to use his bathroom. When White left to go to the bathroom, Driskell testified that he saw some music compact discs in the plastic bag the beer was in. According to Driskell, the police and an ambulance appeared at Raybon's house about 10 to 15 minutes after White left his house. (R. 685-88.)
Mark Wilson testified that he saw White at about 7:00 p.m. on February 3, 2000, at a gas station near where the murder occurred. Wilson stated that White approached him and Ronald Malone and tried to sell them a gold chain necklace. Wilson stated that he left the store, but came back a short time later and saw White trying to sell some videocassettes to some other men. (R. 704-08.) Malone confirmed that White approached him and Wilson, and Malone testified that White tried to sell them a necklace and some compact discs. Malone testified that he believed the necklace was gold. Malone, who lived in the area, also testified that White came by his house later that evening and again tried to sell the compact discs to him. (R. 716-18.) Shawn Hammons also testified that White approached him shortly after 7:00 p.m. at the gas station across the street from where White had spoken with Wilson and Malone. Hammons testified that White was holding a beer in a paper sack, told him that he was "F____ed up," and tried to sell him a gold chain necklace. (R. 723-24.)
Renee White, White's cousin, stated that White came by her house between 7:00 and 8:00 p.m. on February 3, 2000, and that she purchased a gold chain necklace from him. Renee testified that she got scared and broke the necklace and threw it into a field. She later went to the field and retrieved part of the broken necklace and gave it to the police. (R. 735-46.)
Shane Greenhall testified that a black male, who was drinking a beer and acting strangely, walked up to his truck at about 8:00 p.m. on February 3, 2000, at an intersection near the scene of the crime and asked for a ride to North Beatty Street in Athens. (R. 727-29; 756-57.) White lived with his mother on North Beatty Street. (R. 881.)
Det. Slaton testified that he took a statement from White on February 5, 2000, and that White changed his story several times. At first, White told Det. Slaton that he and Newton went by Raybon's house between 4:30 and 5:00 p.m. and left there and went to another person's house, where he admitted to stealing three compact discs. White claimed that Newton then dropped him off at Raybon's house at "dusky dark," but that he did not go to her house and, instead, went to someone's house a couple of doors down the street. That person, White told Det. Slaton, was not at home, so he went back to Raybon's house, but Raybon did not come to the door, so he went to a gas station around the corner. Det. Slaton testified that upon further questioning, White admitted he went inside Raybon's house on the second occasion and that he sat down and talked with her awhile. White told Det. Slaton that he left after a few minutes, that Raybon was alive when he left, and that he went to the local gas station and attempted to sell the compact discs that he had stolen. White denied that he stole anything from Raybon's house and denied that he *Page 1269 
tried to sell anything else at the gas station. Det. Slaton then testified that he told White that he had interviewed witnesses who disclosed that White was trying to sell a gold chain. White then told Det. Slaton that he tried "to sell an old fake gold chain that he had stole[n]" from someone else. Det. Slaton testified that White finally "admitted to stealing the necklace from [Raybon's] house, but not killing her. He said the chain was [lying] on the table when he stole it. He admitted that he attempted to sell the chain to Mark Wilson, Ronald Malone, and an unknown white male. . . ." White told Det. Slaton that he did not recall what happened to the necklace. White denied he went to Willie Driskell's house, and denied taking the necklace from Raybon's neck. White then terminated the interview and stated, "`I have said too much already.'" (R. 833-38.)
Nancie Jones, the ADFS forensic scientist who performed the DNA testing, testified that she determined there were possible bloodstains on several items that were submitted to her for review, including clothing collected from White, a knife, and a foam mattress. (R. 957-58.) Jones testified that the bloodstains found on the knife, on White's clothing, and on the foam mattress were consistent with the victim's DNA. (R. 969-75, 1010.) She also testified that the DNA results from a saliva sample taken from a cigarette butt found at the scene of the crime were consistent with the DNA of White and from an unidentified donor. (R. 968.)
The evidence indicated that White forced his way into Raybon's house by prying open the front door; that, once inside the house, White brutally beat, strangled, and stabbed Raybon using of a curtain tie and a knife; that White removed a necklace from Raybon's body; and that White stole five rings from Raybon's house. White, himself, while denying that he killed Raybon or took any property from her by force, admitted that he was in Raybon's house and that he stole a necklace from her. This evidence supports the jury's verdict, finding that White committed the charged crimes.
 X.
Lastly, White contends that his convictions for two counts of capital murder and for the corresponding lesser-included offenses of robbery and burglary constitute double jeopardy. In Ex parteHaney, 603 So.2d 412, 419 (Ala. 1992), the Alabama Supreme Court stated:
 "Haney was charged with and convicted of two counts of capital murder: murder for hire, Ala. Code 1975, § 13A-5-40(a)(7), and murder during a robbery, Ala. Code 1975, § 13A-5-40(a)(2). Both of the counts were based on the same act, the intentional killing of her husband. However, because each crime contains an element not contained in the other, there was no violation of the prohibition against double jeopardy. Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932); Jackson v. State, 516 So.2d 726 (Ala.Crim.App. 1985). See also Ex parte Henderson, 583 So.2d 305 (Ala. 1991) (murder during a robbery and murder done for pecuniary gain)."
See also Stewart v. State, 601 So.2d 491, 495 (Ala.Crim.App. 1992). In Powell v. State, 631 So.2d 289, 292 (Ala.Crim.App. 1993), we affirmed the defendant's conviction for two counts of capital murder, where the defendant was indicted, as here, for murder made capital because it was committed during a robbery and murder made capital because it was committed during a burglary. And, as in the present cause, the events leading to the indictment *Page 1270 
and conviction of the defendant arose out of the same incident.
Therefore, White's conviction for two counts of capital murder arising out of the same incident is supported by the evidence and the law. However, White is correct that his convictions and subsequent sentencing for the underlying counts of robbery and burglary cannot stand. Moreover, the State concedes that White's convictions and sentences for robbery and burglary are due to be vacated. Section 13A-1-8(b)(1), Ala. Code 1975, establishes:
 "When the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense. He may not, however, be convicted of more than one offense if . . . [o]ne offense is included in the other, as defined in Section 13A-1-9 [the lesser-included offense statute]. . . ."
As we stated in Adams v. State, [Ms. CR-98-0496, Aug. 29, 2003] ___ So.2d ___, ___ (Ala.Crim.App. 2003):
 "A defendant cannot be convicted of both a capital offense and a lesser offense that is included in the capital charge. See Mangione v. State, 740 So.2d 444 (Ala.Crim.App. 1998); Borden v. State, 711 So.2d 498 (Ala.Crim.App. 1997), aff'd, 711 So.2d 506
(Ala. 1998). As this Court stated in Mangione:
 "`While the appellant was properly charged with the two capital offenses, see Borden, 711 So.2d at 503-04, n. 3, and both offenses were properly submitted to the jury, the prohibition against double jeopardy was violated when the appellant was convicted of the capital offense of murder during the course of a kidnapping under Count I of the indictment and also was convicted of the lesser-included offense of intentional murder under Count II of the indictment, because the "same murder was an element of the capital offense and the intentional murder conviction." Borden, 711 So.2d at 503. See also Coral v. State, 628 So.2d 954, 958
(Ala.Cr.App. 1992), aff'd, 628 So.2d 1004 (Ala. 1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994) (holding that the defendant's conviction of the lesser-included offense of intentional murder under a count alleging the capital offense of murder-robbery and his conviction of the capital offense of murder-burglary violated the principles of double jeopardy where the same murder was an element of both convictions).'
 "740 So.2d at 449. Accordingly, this case must be remanded for the trial court to vacate the conviction for the robbery of Andrew Mills because that offense was included in the capital offense for which he was convicted."
Just as in Adams, White's convictions and sentences for robbery in the first degree and burglary in the first degree must be vacated.
 Conclusion
Based on the foregoing, White's convictions for capital murder based on burglary-homicide and capital murder based on robbery-homicide are affirmed. However, for the reasons set forth in Part X of this opinion, White's convictions for first-degree robbery and first-degree burglary cannot stand. Accordingly, we remand this case to the circuit court with instructions that it vacate White's convictions for first-degree burglary and first-degree robbery. On remand the court shall take all necessary action to see that the circuit court makes due return to this Court at the earliest possible time and within 42 days of the release of this opinion. *Page 1271 
AFFIRMED IN PART; REMANDED WITH DIRECTIONS.*
McMILLAN, P.J., and BASCHAB and SHAW, JJ., concur. COBB, J., concurs in the result.
[1] For further discussion of the photographs and White's objections thereto, see Part VII.F., infra.
[2] On questioning instigated by White, Dr. Pustilnik testified that he did report to the investigating officers that some of Raybon's injuries were consistent with sexual assault, but he denied telling anyone that he found evidence of semen or other body fluids during his autopsy. (R. 792, 812-14, 815-16, 819.) Apparently, White explored this line of questioning to attempt to further impeach Dr. Pustilnik, since there was no indication that a rape occurred.
[3] Newton testified that she took off running because she knew there was an outstanding warrant for her arrest related to a theft charge. Newton was serving time in prison on an unrelated matter at the time of trial. (R. 621, 647.)
* Note from the reporter of decisions: On August 13, 2004, on return to remand, the Court of Criminal Appeals affirmed, without opinion. On September 17, 2004, that court denied rehearing, without opinion.